# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FORT MYERS DIVISION

**ERIN MARGARET BYRNE**,
    Plaintiff,

v.                                                                 2:24-cv-336-NPM

**COMMISSIONER OF SOCIAL SECURITY**,
    Defendant.

## OPINION AND ORDER

Plaintiff Erin Margaret Byrne seeks judicial review of a denial of Social Security disability benefits. The Commissioner of the Social Security Administration filed the transcript of the administrative proceedings (Doc. 13), Byrne filed an opening brief (Doc. 14), and the Commissioner responded (Doc. 16). As discussed in this opinion and order, the decision of the Commissioner is affirmed.

**I.    Eligibility for Disability Benefits and the Administration's Decision**

    **A.    Eligibility**

The Social Security Act and related regulations define disability as the inability to do any substantial gainful activity by reason of one or more medically determinable physical or mental impairments that can be expected to result in death or that have lasted or can be expected to last for a continuous period of not less than twelve months.[1] Depending on its nature and severity, an impairment limits

---
[1] *See* 42 U.S.C. §§ 416(i), 423(d), 1382c(a)(3); 20 C.F.R. § 416.905.

exertional abilities like walking or lifting, nonexertional abilities like seeing or hearing, tolerances for workplace conditions like noise or fumes, or aptitudes necessary to do most jobs such as using judgment or dealing with people.[2] And when functional limitations preclude both a return to past work and doing any other work sufficiently available in the national economy (or an impairment meets or equals the severity criteria for a disabling impairment as defined in the regulatory "Listing of Impairments"), the person is disabled for purposes of the Act.[3]

### B.    Factual and procedural history

On August 18, 2020, Byrne applied for disability insurance benefits and supplemental security income. (Tr. 20, 24–50). On behalf of the administration, a state agency reviewed[4] and denied Byrne's application initially on June 23, 2021, and upon reconsideration on May 4, 2022. (Tr. 20, 89-90, 111–112, 126, 138). On July 24, 2023, Byrne amended her alleged onset date to August 18, 2020, and withdrew her request for disability insurance benefits. (Tr. 20–21, 267–268). She alleged disability due to the following: memory loss, inability to focus, vertigo,

---

[2] *See* 20 C.F.R. §§ 416.913(a)(2)(i)(A)–(D) (discussing the various categories of work-related abilities), 416.922(b) (providing examples of abilities and aptitudes necessary to do most jobs), 416.945(b)–(d) (discussing physical, mental, and other abilities that may be affected by an impairment).

[3] *See* 20 C.F.R. § 416.911(a).

[4] In Florida, a federally funded state agency develops evidence and makes the initial determination whether a claimant is disabled. See 42 U.S.C. § 421(a); 20 C.F.R. § 416.903(a).

brain fog, migraines, lack of coordination, inability to maintain grip, depression, anxiety, difficulty breathing, muscle spasms, pain, "comprehension issues," and exhaustion. (Tr. 287). As of the alleged onset date, she was 36 years old and had completed two years of college education. (Tr. 33–35). Byrne previously worked as an animal trainer and salesperson. (Tr. 288).

At Byrne's request, Administrative Law Judge (ALJ) Mario Silva held a hearing during which Byrne was represented by an attorney. (Tr. 41–74). On December 22, 2023, the ALJ issued a decision finding Byrne not disabled. (Tr. 17–40, 172-174). The administration's Appeals Council denied Byrne's request for review. (Tr. 1–6). Byrne then brought the matter to this court, and the case is ripe for judicial review.

### C. The ALJ's decision

The ALJ must perform a five-step sequential evaluation to determine if a claimant is disabled. 20 C.F.R. § 416.920(a)(1). This five-step process determines:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether, in light of [her] age, education, and work experience, the claimant can perform other work that exists in significant numbers in the national economy.

*Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 933 (11th Cir. 2015) (internal quotation omitted); *see also* 20 C.F.R. § 416.920(a)(4).

The governing regulations provide that the Social Security Administration conducts this "administrative review process in an informal, non-adversarial manner." 20 C.F.R. § 416.1400(b). Unlike judicial proceedings, Social Security Administration hearings "are inquisitorial rather than adversarial." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1364 (11th Cir. 2018) (quoting *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (plurality opinion)). "Because Social Security hearings basically are inquisitorial in nature, '[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.'" *Id.* Indeed, "at the hearing stage, the commissioner does not have a representative that appears 'before the ALJ to oppose the claim for benefits.'" *Id.* (quoting *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000)). "Thus, 'the ALJ has a basic duty to develop a full and fair record. This is an onerous task, as the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" *Id.* (quoting *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015)).

Nonetheless, while the claimant is relieved of the burden of production during step five as to whether there are enough jobs someone like the claimant can perform, the claimant otherwise has the burdens of production and persuasion throughout the process. *See* 20 C.F.R. § 416.912 (providing that the claimant must prove disability); *see also Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (noting the regulations "place a very heavy burden on the claimant to demonstrate both a

qualifying disability and an inability to perform past relevant work"). In short, the "overall burden of demonstrating the existence of a disability as defined by the Social Security Act unquestionably rests with the claimant." *Washington*, 906 F.3d at 1359 (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1280 (11th Cir. 2001)).

At step one of the evaluation, the ALJ found Byrne had not engaged in substantial gainful activity since August 18, 2020, the alleged onset date. (Tr. 23). At step two, the ALJ characterized Byrne's severe impairments as: a vision deficit; migraines; obesity; diabetes mellitus; an upper motor neuron lesion; insomnia; depression; anxiety; and a memory deficit. *Id.* At step three, the ALJ determined Byrne did not have an impairment or combination of impairments that met or medically equaled the severity of an agency-listed impairment. *Id.*

> As a predicate to step four, the ALJ arrived at the following RFC:
>
> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except as follows. The claimant can lift and carry up to 20 pounds occasionally and up to 10 pounds frequently; stand and/or walk for up to six hours and sit for up to six hours for a combined total of eight hours per day with normal breaks. The claimant is never able to climb ladders, ropes, or scaffolds, but is otherwise able to engage in the remaining postural activities on an occasional basis, such as climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling. The claimant should avoid all exposure to extreme cold, as defined in the DOT/SCO. The claimant is limited to a noise environment of where the noise does not exceed SCO level 3, also defined as moderate in the DOT/SCO. The claimant is limited to no more than occasional exposure to no more than moderate levels of vibration, as noted in the DOT/SCO. The claimant should never be exposed to hazards, which includes unprotected moving mechanical parts or to unprotected heights. The claimant is limited to jobs that do not require near acuity, typically defined as less than 20 inches. The claimant requires a job that does not require more than occasional use of a computer screen. The

5

claimant is able to **understand, remember, and carry out simple and routine instructions or tasks**. The claimant is able to **make judgments or decisions on simple routine instructions or tasks** in such work environment. The claimant is able to respond and adapt to routine work situations and to occasional changes in the work setting without special supervision but with simple and routine instructions or tasks. The claimant can interact appropriately with others in a work throughout a standard workday without distracting them or exhibiting behavioral extremes so long as it is no more than brief and superficial interaction with the public, no more than brief and superficial interaction with coworkers, no more than occasional interaction with supervisors. However, the claimant can interact sufficiently to receive daily task assignments and respond to brief status updates. The claimant is able **to maintain concentration, persistence, and pace for two-hour blocks but requires a job that provides a break normally offered to all employees of about 10 or 15 minutes, twice per day, two hours after the start of the shift approximately, and two hours after the lunch break**. Further, there would be a standard meal break of about 30 minutes. The claimant must be able to work at **a flexible pace, defined as a work environment that is free of face-paced [sic] production** work and free of fixed-timed hourly units during the work shift but employer-set end-of-the-workday productivity goals. (Tr. 26–27) (emphasis added).

Consequently, the ALJ found Byrne unable to perform her past relevant work. (Tr. 33). At step five, the ALJ found Byrne could perform other work that exists in significant numbers in the national economy. (Tr. 34). In support, a vocational expert testified that an individual of Byrne's age, education, work experience, and RFC can perform jobs within the following representative occupation:

- *Cleaner Housekeeping*, DOT #353.687-014, light, SVP 2, with 178,000 jobs.[5]

---

[5] The DOT numbers refer to the Dictionary of Occupational Titles and its detailed explanations concerning each occupation's requirements. These descriptions include exertion and skill levels. Exertion refers to the work—in a purely physical sense—that the job requires, and it is divided into five categories: sedentary, light, medium, heavy, and very heavy. Skill refers to the time it takes—during or before a job, such as prior experience or education—to develop necessary abilities, and it is divided into three categories: unskilled, semiskilled, and skilled. The "SVP" (Specific Vocational Preparation) provides further subdivision of the three skill categories into

(Tr. 34).[6] Thus, for purposes of the Act, the ALJ concluded Byrne was not disabled from August 18, 2020, the alleged onset date, through December 22, 2023, the date of decision. (Tr. 35).

## II. Analysis

The issue on appeal is whether substantial evidence supports the ALJ's conclusion that the intensity, persistence, and limiting effects of Byrne's impairments were not as disabling as alleged, and thus, did not preclude simple, light-duty work involving brief or superficial interaction with others.

### A. Standard of review

The court "may not decide the facts anew, make credibility determinations, or reweigh the evidence." *Buckwalter v. Acting Comm'r of Soc. Sec.*, 997 F.3d 1127, 1132 (11th Cir. 2021). While the court must account for evidence both favorable and unfavorable to a disability finding and view the evidence as a whole, *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), the court's review of the administration's decision is limited to determining whether "it is supported by substantial evidence

---

nine levels: SVP 1 and 2 are unskilled; SVP 3 and 4 are semiskilled; and SVP 5 through 9 are skilled. The expert's job number was for the national economy.

[6] The ALJ acknowledged that, typically, three occupations with a significant number of jobs would be identified. The ALJ reasoned, however, that "SSR 83-10 provides that whether work exists in the national economy for any particular individual depends on whether there is a significant number of jobs (**in one or more occupations** [emphasis supplied by ALJ]) with requirements that the individual is able to meet, considering his or her remaining physical and mental abilities and vocational qualifications. The undersigned finds that 178,000 jobs, even though limited to one occupation is a significant number of jobs." (Tr. 34).

and based on proper legal standards." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020) (quoting *Crawford*, 363 F.3d at 1158)).

"[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The inquiry is "case-by-case," and "defers to the presiding ALJ, who has seen the hearing up close." *Id*. at 1157. In other words, a "presumption of validity attaches" to the ALJ's factual findings. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). And if supported by substantial evidence, the ALJ's findings of fact are conclusive. 42 U.S.C. § 405(g). This means the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the court finds that the evidence "preponderates against" the agency's decision. *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317, 1323 (11th Cir. 2020) (quoting *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991)).

### B. The ALJ properly considered the effects of Byrne's impairments, and the RFC is supported by substantial evidence.

Byrne argues that because the ALJ discounted a medical opinion of record and her own subjective statements about the purported effects of her limitations, the ALJ failed to fully appreciate the "total limiting effects" of her severe impairments. (Doc. 14 at 1, 8-17). According to Byrne, the RFC is based upon the ALJ's highly

8

selective and deficient analysis of the facts and is not logically bridged to the record. (Doc. 14 at 6–14). Thus, Byrne asserts the RFC is not supported by substantial evidence. *Id.* at 16.

A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. § 416.945(a). To determine a claimant's RFC, an ALJ must "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe[.]" 20 C.F.R. § 416.945(e). In other words, "[a]n RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite h[er] impairments." *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). "In making this holistic assessment, the ALJ considers evidence such as the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; the type, dosage, effectiveness, and side effects of any medication or other treatment the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures the claimant uses or has used to relieve pain or symptoms; and any other factors concerning the claimant's functional limitations and restrictions." *Cnossen v. Comm'r of Soc. Sec.*, No. 2:22-cv-574-KCD, 2023 WL 5013394, *4 (M.D. Fla. Aug. 7, 2023).

Contrary to Byrne's claim, the record shows that the ALJ considered the "total limiting effects" of her impairments, and the ALJ's findings are supported by substantial evidence. The ALJ considered Byrne's testimony concerning the intensity, persistence, and limiting effects of her physical and mental impairments, which caused difficulty with holding a leash, bending, standing, walking, vision, memory, concentration, motivation, panic attacks, and functioning in crowds. (Tr. 27–28, 53–65, 427). And while the ALJ found that Byrne's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ concluded that the treatment history, objective medical findings, and other evidence of record did not support Byrne's statements about the effects of her symptoms. (Tr. 28–33). Then the ALJ outlined the evidence that supports the RFC—nothing more is required.

Byrne's critique starts with the assertion that the ALJ failed to properly consider a medical opinion from consultative examiner Dr. James Owen. (Doc. 14 at 10–14). "A medical opinion is a statement from a medical source about what the claimant can still do despite her impairment(s) and whether she has one or more impairment-related limitations or restrictions." 20 C.F.R. § 416.913(a)(2). When confronted with a medical opinion, an ALJ must assess its persuasiveness based on several factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length, frequency, and purpose of the examination and any treatment

relationship; (4) specialization; and (5) other factors, such as the source's familiarity with other evidence concerning the claim, that tend to support or contradict the medical opinion. 20 C.F.R. § 416.920c(c). Supportability and consistency are the most important factors and must be explained by the ALJ. *See* 20 C.F.R. § 416.920c(b)(2). Supportability refers to "the objective medical evidence and supporting explanations presented by a medical source … to support his or her" opinion. 20 C.F.R. § 416.920c(c)(1). Consistency looks to whether "the evidence from other medical sources and nonmedical sources" is consistent with the medical opinion presented. 20 C.F.R. § 416.920c(c)(2).

Dr. Owen's November 2020 exam (Tr. 426–429) revealed that Byrne had intact cranial nerves; normal strength, sensation, and coordination; and normal reflexes in all extremities. Owen observed that Byrne had no clonus[7], but she had a positive Babinski[8] and Hoffman's[9] on the left side with a positive Romberg.[10] He

---

[7] Clonus is "a rhythmic oscillating stretch reflex that is related to upper motor neuron lesions." National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK534862/ (last visited Sept. 29, 2025).

[8] The Babinski reflex "tests the integrity of the corticospinal tract," and the presence of a Babinski sign may suggest damage to the corticospinal tract. National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK519009/ (last visited Sept. 29, 2025).

[9] The Hoffman sign is "an involuntary flexion movement of the thumb and or index finger when the examiner flicks the fingernail of the middle finger down." The presence of a Hoffman's sign "indicates an upper motor neuron lesion and corticospinal pathway dysfunction likely due to cervical cord compression." National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK545156/ (last visited Sept. 29, 2025).

[10] This Romberg test "illustrates a diagnostic, non-technical, physical test that identifies a specific

also noted that Byrne had some upper motor neuron problems that he believed needed further diagnosis. Byrne was "very wobbly" with movements; however, her strength and squat were 5/5, and the remainder of her ranges of motion were all within normal limits. Owen opined that Byrne may have an upper motor neuron lesion and "would have severe difficulty lifting, handling, or carrying objects."

The ALJ found Owen's opinion unpersuasive, noting that his opinion regarding Byrne's severe difficulty lifting, handling, or carrying objects was unsupported by his own findings that Byrne had intact cranial nerves, 5/5 strength, normal pulses, and no edema. (Tr. 32). The ALJ further found that Owen's opinion was inconsistent with Byrne's normal exam findings in other record evidence. *Id.* For example, other treatment records demonstrate that Byrne had 5/5 strength in the bilateral upper extremities, equal bilateral grip strength, and 5/5 strength as to her right shoulder abduction, adduction, internal and external rotation, and normal left shoulder strength and range of motion. (Tr. 32, 439, 451, 596).

Byrne argues the ALJ's supportability finding is flawed because the ALJ "cherry-picked" certain findings within Owen's opinion while overlooking contradictory evidence indicating Byrne would severely struggle to lift, handle, and

---

neurologic impairment." "The Romberg sign removes the visual and vestibular components that contribute to maintaining balance and can thus identify a proprioception-related neurologic disease." National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK563187/ (last visited Sept. 29, 2025).

carry objects. (Doc. 14 at 12). But "there is a fine line between evaluating the decision for 'cherry-picking' and reweighing the evidence." *Frangione v. Comm'r of Soc. Sec.*, No. 6:20-cv-1298-GJK, 2021 WL 9569655, *5 (M.D. Fla. Sept. 24, 2021). Byrne asks the court to cross that line.

Byrne argues the ALJ did not consider Owen's findings that she had poor balance, was "very wobbly," and had trouble walking and standing straight; she had a positive Babinski sign and Hoffman's sign on the left side; and that a review of systems was positive for dizziness, ringing in the ears, blurred vision, and shortness of breath. (Doc. 14 at 12). But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection which is not enough to enable a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." *Mitchell v. Comm'r Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (cleaned up).

The ALJ's decision was far from a broad rejection. Indeed, the ALJ explicitly discussed Owen's exam findings that Byrne had positive Babinski and Hoffman's on the left side, an upper motor neuron problem, a positive Romberg with very wobbly movements, and severe difficulty lifting, handling, or carrying objects, but noted that the remainder of the exam findings were normal. (Tr. 28, 32). Although Byrne points to other evidence from Owen's exam, "the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the

13

administrative findings." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004). So we must decline the invitation to reweigh the evidence and potentially come to a different conclusion. *See Borges v. Comm'r of Soc. Sec.*, 771 F. App'x 878, 882 (11th Cir. 2019) ("To the extent that [plaintiff] points to other evidence that would undermine the ALJ's RFC determination, her contentions misinterpret the narrowly circumscribed nature of this Court's appellate review, which precludes it from re-weighing the evidence or substituting its own judgment for that of the Commissioner.").

Turning to the consistency factor, Byrne takes issue with the ALJ citing portions of three medical records to support his finding that Owen's opinion is inconsistent with other record evidence, and in doing so, cites other evidence that may tend to corroborate Owen's opinion. (Doc. 14 at 13–14). Specifically, Byrne points to reports of neuropathic pain and tremors, psoriatic arthritis, an unknown "rheumatologic condition," a "slight limitation with respect to her right shoulder," and shoulder pain. (Tr. 439–440, 451, 596).

In essence, Byrne is asking us to view the ALJ's assessment of Owen's opinion in isolation. But "just as the ALJ considered the record as a whole, his decision must be read in the same manner." *Erlich v. Comm'r of Soc. Sec.*, No. 2:23-cv-738-SPC-NPM, 2024 WL 4039565, *8 (M.D. Fla. July 30, 2024). On that score, the ALJ provided a thorough discussion of Byrne's treatment records and medical

evidence, which includes additional examples of unremarkable exam findings that are inconsistent with Owen's opinion. (Tr. 28–31).

For instance, the ALJ considered records dating from 2020 through 2023, which revealed that Byrne had a normal range of motion with 5/5 strength in all extremities, and no evidence of dysdiadochokinesis,[11] flaccidity,[12] cog wheeling,[13] or neurological focal deficits. In addition, the ALJ cited to recent MRIs of Byrne's brain and spine, all of which were normal. (Tr. 28-29, 451, 478, 596, 754-756, 633, 881-882). So while the ALJ may have only cited to three pages of treatment notes *as examples* of inconsistent findings, a review of the ALJ's decision as a whole reveals his rejection of Owen's opinion—that Byrne had severe difficulty lifting, handling, or carrying—is supported by a raft of evidence, which comprises more than a scintilla of relevant evidence that a reasonable person would accept as adequate to find Owen's opinion unpersuasive.

---

[11] Diadochokinesis is the "inability to perform rapid alternating muscle movements." National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK559262/ (last visited Sept. 29, 2025).

[12] Flaccidity is a "type of paralysis in which a muscle becomes soft and yields to passive stretching, which results from loss of all or practically all peripheral motor nerves that innervated the muscle." National Library of Medicine, https://www.ncbi.nlm.nih.gov/medgen/10131 (last visited Sept. 29, 2025).

[13] Cogwheeling is "muscular rigidity in which passive movement of the limbs (as during a physical examination) elicits ratchet-like start-and stop movements through the range of motion of a joint (as of the elbow) and that occurs especially in individuals affected with Parkinson's disease." Merriam-Webster, https://www.merriam-webster.com/medical/cogwheel%20rigidity (last visited Sept. 29, 2025).

In sum, what matters is whether "a reviewing court can make a meaningful assessment of a challenge to an ALJ's evaluation of the persuasiveness of [the] medical opinions." *Works v. Saul*, No. 4:19-cv-01515-MHH, 2021 WL 690126, *15 (N.D. Ala. Feb. 23, 2021). There is enough here for meaningful review. The ALJ's detailed consideration of Byrne's treatment history and medical records show why he found Owen's opinion unpersuasive.

Next, Byrne claims that when formulating the RFC, the ALJ failed to include additional limitations to account for her use of a service animal and an assistive device, and her need to write down instructions. Byrne therefore asserts that the RFC is not based on an accurate and "logical bridge" to the record. (Doc. 14 at 14-17). But a logical bridge simply means that "an ALJ must articulate at some minimum level, h[is] analysis of the evidence." *Chait v. Comm'r of Soc. Sec.*, No. 2:23-cv-400-KCD, 2024 WL 3534098, *8 (M.D. Fla. July 25, 2024) (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001)). The ALJ did so here.

Byrne testified that she has a dog trained to alert her when her heart rate is irregular or her blood sugar is low, and there are instances when she brought her dog to medical appointments. (Tr. 29, 27, 59, 489, 595). But a service dog "must be medically necessary to be considered in an RFC assessment." *Cruz v. Commr. of Soc. Sec.*, 406 F. Supp. 3d 1337, 1346 (M.D. Fla. 2019) (citation omitted). Medical necessity depends on whether "the service dog was medically prescribed or

16

recommended." *Id.* Byrne has pointed to no evidence showing that her service dog was medically prescribed or even recommended by a medical source. "Without such evidence, the ALJ was not required to consider the need for a service dog in his RFC assessment." *Hewitt v. Saul*, No. 8:19-cv-83-T-SPF, 2020 WL 1181953, *3 (M.D. Fla. Mar. 12, 2020).

Byrne also contends the ALJ failed to assess whether her cane was medically necessary and to ask the vocational expert ("VE") how it would impact the occupational base of available work. In particular, Byrne asserts the ALJ failed to heed SSR 96-9p, which is an administrative policy interpretation that explains the administration's policies "regarding the impact of [an RFC] assessment for ***less than a full range of sedentary*** work on an individual's ability to do other work." SSR 96-9p, 1996 WL 374185, *1 (July 2, 1996) (emphasis added). But in this matter, the "RFC does not limit [Byrne] to less than sedentary work, or even sedentary work. It limits [her] to light work. So this SSR has no place here." *Kolas v. Comm'r of Soc. Sec.*, No. 6:22-cv-2413-NPM, 2024 WL 1252386, *5 (M.D. Fla. Mar. 25, 2024); *see also Machicote v. Comm'r of Soc. Sec.*, No. 6:20-cv-1907-GKS-EJK, 2022 WL 769997, *4 (M.D. Fla. Jan. 3, 2022), *report and recommendation adopted*, 2022 WL 768017 (Mar. 14, 2022) (collecting cases and holding SSR 96-9p does not apply in cases where the claimant is found to have an RFC to perform more than sedentary work). And even if SSR 96-9p was instructive, it does not require an ALJ to find

17

that an assistive device is medically required. Rather, it outlines the minimum showing a claimant must make before an ALJ will make such a determination, mandating only that the ALJ "always consider the particular facts of a case." SSR 96-9p, 1996 WL 374185, *7. The ALJ satisfied that mandate here.

Indeed, the ALJ noted that on July 28, 2021, Byrne had a normal gait with no limitations, disturbances, or deformities and did "not require ambulatory aids." (Tr. 28, 479). And the ALJ reasoned that Byrne's daily activities of walking her dog, driving, and traveling for several months throughout the United States were inconsistent with her claim that she needs an assistive device to ambulate and stand in line. (Tr. 31). Thus, the ALJ rejected Byrne's need for a cane based on substantial evidence and, as such, complied with any purported obligation under this SSR.[14] *See Wright v. Colvin*, No. cv-313-079, 2014 WL 5591058, *5 (S.D. Ga. Nov. 3, 2014) ("In affirmatively rejecting the need for the cane and giving reasons based on substantial evidence, the ALJ performed the analysis required by SSR 96-9p.").

Finally, Byrne argues that she consistently reported issues with her memory, brain fog, and anxiety. She points to her subjective reports that she is easily distracted, forgetful, and loses time altogether; forgets that she leaves the stove on;

---

[14] "[T]he ALJ [is] not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported." *Hewitt*, 2020 WL 1181953, at *3 (citation omitted). Therefore, the ALJ was not required to incorporate limitations arising from Byrne's need for a cane in the hypothetical to the VE.

18

is easily overwhelmed and unable to remember many short-term tasks; has brain fog; and that she suffered a traumatic brain injury after a motor vehicle accident and is anxious and depressed. From this, she argues the RFC should include a limitation related to her purported inability to remember and follow instructions without writing them down. (Doc. 14 at 15-16).

However, the ALJ considered Byrne's testimony and medical evidence regarding her memory and mental impairments, including her being forgetful, needing to read a paragraph three or four times and still getting lost, and having difficulty remembering, focusing, and being easily distracted, along with feeling depressed and anxious. (Tr. 27-33, 49-66, 427). Nonetheless, the ALJ found that Byrne's claims of severe memory and mental deficits were inconsistent with the mental-status-examination findings and treatment records. (Tr. 29).

Specifically, the ALJ noted that her routine and conservative medical-treatment history does not support her debilitating allegations. (Tr. 31) The ALJ observed that Byrne was referred to neurology for memory evaluation, but she did not follow up, and she was never evaluated on an urgent or emergency basis for anxiety or depression. *Id.* The ALJ also took note of treatment records from 2020 reporting that Byrne had not taken medication for two years. Despite her claimed memory issues, records also showed Byrne had intact memory and reasoning, average intelligence, no clouding of consciousness, normal results from a brain MRI,

19

and normal mental-status exams in 2022 and 2023. (Tr. 451-452, 483, 479-480, 561-562, 664, 726, 754-57, 916). Still, the ALJ included limitations in Byrne's RFC to account for her mental impairments, restricting her to simple, routine tasks or instructions for two-hour blocks at a flexible pace, without fast-paced work, and with social limitations. (Tr. 26-27). At bottom, the ALJ considered Byrne's mental impairments when formulating the RFC, which rests upon more than a scintilla of relevant evidence that a reasonable person would accept as adequate.

### III. Conclusion

Upon consideration of the submissions of the parties and the administrative record, substantial evidence supports the ALJ's decision, and there was either no error or no harmful error in the ALJ's application of the correct legal standards. Accordingly, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g), and the clerk is directed to enter judgment in the Commissioner's favor, terminate all scheduled events, and close the case.

**ORDERED** on September 29, 2025

_____
NICHOLAS P. MIZELL
United States Magistrate Judge